EVA PATERSON (SBN: 67081)
MONA TAWATAO (SBN: 128779)
**Equal Justice Society**
1939 Harrison Street, Suite 818
Oakland, California 94612
Telephone: (415) 288-8700
Facsimile: (510) 338-3030
Email: epaterson@equaljusticesociety.org
        mtawatao@equaljusticesocity.org

CARLY J. MUNSON (SBN: 254598)
BRIDGET CLAYCOMB (SBN: 312001)
**Disability Rights California**
1831 K Street
Sacramento, California 95811
Telephone: (916) 504-5800
Facsimile: (916) 504-5801
Email: carly.munson@disabilityrightsca.org
        bridget.claycomb@disabilityrightsca.org

MICHAEL HARRIS (SBN: 118234)
**National Center for Youth Law**
405 14th Street, Floor 15
Oakland, California 94612
Telephone: (510) 835-8098
Facsimile: (410) 835-8099
Email: mharris@youthlaw.org

ANTOINETTE DOZIER (SBN: 244437)
RICHARD ROTHSCHILD (SBN: 67356)
**Western Center on Law and Poverty**
3701 Wilshire Boulevard, Suite 208
Los Angeles, California 90010
Telephone: (213) 487-7211
Facsimile: (213) 487-0242
Email: adozier@wclp.org
        rrothschild@wclp.org

*Attorneys for Plaintiffs*

DISABILITY RIGHTS CALIFORNIA
1831 K STREET
SACRAMENTO, CALIFORNIA 95811
(916) 504-5800

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BLACK PARALLEL SCHOOL BOARD; S.A., by and through his Next Friend, AMY A.; K.E., by and through his Next Friend, JENNIFER E.; C.S., by and through his General Guardian, SAMUEL S.; on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>SACRAMENTO CITY UNIFIED SCHOOL DISTRICT; JORGE A. AGUILAR, Superintendent for Sacramento City Unified School District; CHRISTINE A. BAETA, Chief Academic Officer for the Sacramento City Unified School District; JESSIE RYAN, DARREL WOO, MICHAEL MINNICK, LISA MURAWSKI, LETICIA GARCIA, CHRISTINA PRITCHETT, and MAI VANG, members of the Sacramento City Unified School District Board of Education; THE BOARD OF EDUCATION OF SACRAMENTO CITY UNIFIED SCHOOL DISTRICT,<br><br>      Defendants. | DEMAND FOR JURY TRIAL<br><br>**Case No.**<br><br>**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1

## INTRODUCTION

2    1.    Sacramento City Unified School District ("SCUSD" or "the District") has created

3 and perpetuates an unlawful school system that results in modern-day segregation and

4 mistreatment of students with disabilities, particularly Black students with disabilities.  Despite

5 being on notice of its discriminatory conduct for years, the District has not taken steps to

6 effectively eradicate the problems described herein.  As a result, discrimination persists and

7 students languish in a hostile, stigmatizing, and demoralizing school environment.  This lawsuit

8 is brought to end these practices.

9    2.    As the United States Supreme Court observed more than sixty-five years ago,

10 "education is perhaps the most important function of the state and local governments. …  It is

11 required in the performance of our most basic public responsibilities. …  It is the very foundation

12 of good citizenship.  Today it is a principal instrument in awakening the child to cultural values,

13 in preparing him for later professional training, and in helping him to adjust normally to his

14 environment.  In these days, it is doubtful that any child may reasonably be expected to succeed

15 in life if he is denied the opportunity of an education.  Such an opportunity, where the state has

16 undertaken to provide it, is a right which must be made available to all on equal terms." *Brown,*

17 *et al., v. Bd. of Educ. of Topeka, et al.*, 347 U.S. 686, 691 (1954).

18    3.    The Court's landmark decision in *Brown v. Board of Education* began the long

19 road to the racial integration of American public schools and made absolutely clear that "in the

20 field of public education the doctrine of 'separate but equal' has no place.  Separate educational

21 facilities are inherently unequal." 347 U.S. at 692.  Such segregation of children in public

22 schools "generates a feeling of inferiority as to their status in the community that may affect their

23 hearts and minds in a way unlikely ever to be undone." *Id.* at 691.

24    4.    In 1973, Congress echoed these values when passing the Rehabilitation Act of

25 1973.  As Senator Hubert Humphrey then said, "The time has come to firmly establish the right

26 of [Americans with disabilities] to dignity and self-respect as equal and contributing members of

27 society, and to end the virtual isolation of millions of children and adults from society."  118

28

1   Cong. Rec. 32310 (1972).  In 1990, Congress once again affirmed these values by passing the

2   Americans with Disabilities Act to serve as a remedy for "discrimination against individuals with

3   disabilities [which] persists in such critical areas as . . . education." 42 U.S.C. § 12101(a)(3).

4   Congress specifically found that "segregat[ion]" is a "form[] of discrimination against

5   individuals with disabilities." *Id.* § 12101(a)(2).  Accordingly, students with disabilities have the

6   right to be educated side-by-side with their peers without disabilities to the "maximum extent"

7   appropriate.  34 C.F.R. § 104.34.

8        5.     Despite these long-standing laws and precedents, segregation of students with

9   disabilities, and particularly Black students with disabilities, remains rampant in public schools

10   within the District.  Modern-day segregation is subtler than it was in 1954 or 1973, but it is still

11   just as harmful and insidious.  Segregation, as used herein, not only refers to the District's

12   practice of placing students with disabilities in rooms or schools separated from their peers

13   without disabilities, but also encompasses all of the other exclusionary practices used by the

14   District to separate students with disabilities, and Black students with disabilities in particular,

15   from their peers.  Those practices include imposing excessive and exclusionary discipline on

16   students with disabilities for behavior caused by their disabilities, and failing to provide the

17   services, accommodations, and modifications required by law that would allow these students the

18   opportunity to thrive in the general education setting.

19        6.     Superficially, the District's schools may appear equal and integrated.  However,

20   the District has organized its programs and resources in a way that segregates and systematically

21   denies its students with disabilities, particularly Black students with disabilities, a meaningful

22   opportunity to be educated side-by-side with their peers in an inclusive, general education

23   environment.

24        7.     The District effectively segregates almost half of its students with disabilities by

25   relegating them to separate classrooms on otherwise integrated campuses for a majority of the

26   school day or removing them to entirely segregated campuses.  As alleged herein, these

27   segregated students receive disparate and sub-par academic instruction and opportunities, and are

28

1    less likely to graduate from high school, less likely be ready for college or a career, and less

2    likely to meet the grade-level education standards established by the State.  Upon information

3    and belief, this disparate education is even greater for Black students with disabilities.

4         8.     The District's inappropriate segregation of students with disabilities is well-

5    documented.  In 2017, an independent audit of the District's services to students with disabilities

6    noted that the District placed students with disabilities in separate classes and schools at a rate

7    that significantly surpassed both state and nationwide averages.[1]  In particular, the District

8    segregated students with mental health conditions, Autism Spectrum Disorder, and intellectual

9    disabilities at grossly disproportionate rates, with Black students with disabilities experiencing

10   the highest rates of segregated placements.  Upon information and belief, rather than taking steps

11   to remedy its ways, the District has actually increased its use of segregated classrooms and

12   schools for students with disabilities since 2017.

13        9.     This modern-day return to a separate and inherently unequal school system

14   perpetuates stigma, misunderstanding, and fear about students with disabilities.  It reinforces the

15   unwarranted feelings of shame and humiliation these children experience as a result of being

16   deemed unfit to learn alongside their peers.  Children who are placed in these restrictive and

17   isolating environments receive a clear and discriminatory message: by virtue of their disabilities,

18   they are unwelcome in and unsupported by their schools.  As a result, these students are at high

19   risk of extreme and ongoing frustration, greater anxiety, humiliation, lowered self-esteem, and

20   depression, which further interfere with their ability to access education.

21        10.     To make matters worse, students with disabilities, particularly Black students with

22   disabilities, are disparately subjected to exclusionary school discipline and other tactics that

23   remove them from school and exacerbate this stigma.  In 2017, the independent auditors noted

24   that students with disabilities in the District were 2.5 times more likely to be suspended than

---

[1] Council of the Great City Schools, *Improving Special Education Services in the Sacramento City Unified School District* at 49-50 (Spring 2017), https://www.cgcs.org/cms/lib/DC00001581/Centricity/Domain/4/SacramentoSpecialEducation.pdf.

1  those without disabilities.  And, Black students with disabilities were 2.8 times more likely to be

2  suspended than all other students with disabilities.  Similarly, a 2018 report by researchers with

3  the California Community College Equity Assessment Lab called the District "the most

4  egregious suspension district for Black males in the State of California." [2]

5        11.     The District's mistreatment of Black students with disabilities flows from and

6  perpetuates implicit biases and stereotypes that portray Black youth as violent and aggressive,

7  which can lead to unjustified restraint and exclusion.  The District's practices not only

8  communicate these implicit biases and stereotypes, but also risk these students internalizing the

9  underlying message that they do not belong in a hostile educational environment in which their

10  physical and emotional safety are constantly at risk.  The District's actions and failures create

11  real and lasting harms, including emotional trauma and feelings of stigmatization and isolation.

12  Indeed, a hostile educational environment harms not only the students who are dehumanized and

13  discriminated against, but all who witness and are implicitly taught to normalize such

14  discriminatory treatment.

15        12.     The vast majority of children with disabilities can learn in general education

16  classrooms if given the appropriate and legally required services, accommodations, and

17  modifications.  The District must restructure its programs and resources to ensure that all

18  students – including students with disabilities of all races – are afforded a meaningful

19  opportunity to be educated side-by-side with their peers in an inclusive, general education

20  environment and are free from the daily fear of excessive and disparate exclusionary discipline.

21  Only then will students with disabilities receive a truly equal education.

22                                    **JURISDICTION**

23        13.     This action for declaratory and injunctive relief arises under Title II of the

24

25

26  [2] J. Luke Wood, *et al.*, *The Capitol of Suspensions: Examining the Racial Exclusion of Black Males in Sacramento County* at 12 (2018) (available at https://cceal.org/wp-content/uploads/2018/06/sacramento.pdf); *see also* J. Luke Wood, *et al.*, *Get Out! Black Male Suspensions in California Public Schools* (2018) (available at http://blackmaleinstitute.org/wp-content/uploads/2018/02/GET-OUT-Black-Male-Suspensions-in-California-Public-Schools_lo.pdf).

27

28

1   Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the

2   Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, 42 U.S.C. § 1983, the Fourteenth

3   Amendment to the United States Constitution ("Equal Protection Clause"), Title VI of the Civil

4   Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.*, and California Government Code

5   section 11135 *et seq.*

6          14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343,

7   and 1367, because the matters in controversy arise under the Constitution and laws of the United

8   States.  Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights

9   of the parties and to grant all further relief deemed necessary and proper.  The Court's exercise

10  of supplemental jurisdiction over Plaintiffs' claims under state law is proper, as the state law

11  claims "are so related to [Plaintiffs' claims] that they form part of the same case or

12  controversy[.]"  28 U.S.C. § 1367(a).

13                                      **<u>VENUE</u>**

14         15.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §

15  1391(b)(1) and (2).

16         16.    Defendants reside or are organized in the Eastern District of California and a

17  substantial part of the events or omissions giving rise to this action arose in Sacramento County,

18  which is located within the Eastern District of California.

19         17.    Members of the Class reside in the Eastern District of California.  The Plaintiffs

20  reside or are organized in the Eastern District of California.

21                                      **<u>PARTIES</u>**

22                                       *Plaintiffs*

23         18.    Plaintiff Black Parallel School Board ("BPSB") is a community-based

24  membership organization developed to serve Black children, primarily those attending SCUSD.

25  BPSB members include parents of Black students with disabilities who reside within the District,

26  attend a wide array of schools, and are not receiving adequate, necessary, and appropriately

27  individualized services, accommodations, and modifications.  Instead, children of BPSB's

28

1  members experience high rates of exclusionary discipline, segregated placements,

2  discrimination, and harmful and hostile school conditions.  BPSB has diverted its resources from

3  its primary activities and mission to address the District's unlawful policies and practices.

4       19.    Plaintiff S.A. is a fifth-grade student who attends a K-8 school in SCUSD.  S.A. is

5  Black and has been diagnosed with Autism Spectrum Disorder ("Autism") and Anxiety

6  Disorder.  S.A. is one of only a few Black students remaining at his school and, upon

7  information and belief, is the only Black student with Autism at his school.  Although he is

8  capable of learning grade-level curriculum along-side his peers without disabilities, S.A. has

9  never had a properly credentialed teacher to support his inclusion in his public school, has

10  experienced repeated exclusionary discipline and school removals for disability-based behaviors,

11  and has fallen behind his peers without disabilities.  S.A. has also experienced a hostile school

12  environment including staff and peer harassment and bullying based on his race and disabilities.

13  For at least the last year, SCUSD has attempted to push S.A. out of his public school by

14  proposing that he instead be placed in a segregated class or school for students with disabilities.

15  Because of SCUSD's policies, S.A. and his family face a daily choice between two

16  discriminatory options: continue to endure the general education environment where he is not

17  receiving legally mandated and necessary services, or give in to the additional harm of

18  segregation.  S.A. brings this suit through his guardian, Amy A..

19       20.    Plaintiff K.E. is an eleventh-grade Black student with mental health conditions

20  and a likely history of trauma who resides within SCUSD.  Unfortunately, K.E. has never

21  received a proper, comprehensive assessment and his disabilities and needs remain unclear to the

22  District.  Instead, K.E. has been pushed out of his neighborhood school and enrolled in a

23  nonpublic school exclusively for students with disabilities.  His nonpublic school serves fewer

24  than 100 students spanning kindergarten through twelfth grade.  K.E. does not have access to his

25  peers without disabilities, or typical high school experiences and coursework.  Instead, he is

26  subjected to restraints and stigma, and feels daily frustration that he is not learning.  K.E. wants

27  to return to a public school, but cannot do so until SCUSD removes the systemic, structural

28

1   barriers that prevent his meaningful inclusion and access to his education.  The last time that

2   K.E. tried to return to public school in the ninth grade, he experienced repeated exclusionary

3   discipline.  In fact, before the end of the school year, he was unlawfully removed from school

4   entirely and forced to languish at home without any instruction or school placement.  Because of

5   SCUSD's policies, K.E. also faces a choice between two discriminatory options: remain in his

6   segregated setting where he is isolated and not learning, or return to a District school that is not

7   equipped to educate him and meet his disability-related needs.  K.E. brings this suit through his

8   guardian, Jennifer E..

9          21.     Plaintiff C.S. is a fourth-grade SCUSD student who attends a public elementary

10  school.  C.S. is Black and has been diagnosed with Autism Spectrum Disorder, Dyslexia, a

11  specific learning disorder with impairment in written expression, and Attention-Deficit /

12  Hyperactivity Disorder ("ADHD").  C.S. has languished for years while the District ignored his

13  needs and conditions and delayed his identification as a student with disabilities, instead

14  subjecting him to ineffective and unlawful "Student Study Teams."  C.S. has experienced

15  repeated and excessive disciplinary exclusions, shortened school days, and countless hours of

16  missed instruction.  Due to SCUSD's policies, C.S. is facing another daunting school year

17  without appropriate supports and services, or even a proper written plan to address his known

18  disabilities.  Like the other Plaintiffs, though C.S. is capable of accessing grade-level curriculum,

19  he has fallen behind his peers.  C.S. brings this suit through his guardian, Samuel S..

20         22.     Plaintiffs S.A., K.E., and C.S. are referred to herein as "Student Plaintiffs."  The

21  Student Plaintiffs will file a motion with the Court to proceed under fictitious names.

22                                        *Defendants*

23         23.     Defendant Sacramento City Unified School District is a government agency

24  responsible for providing the children who reside within its boundaries with full and equal access

25  to the public education programs and activities it offers in compliance with the requirements of

26  federal and state laws and regulations.  SCUSD is chartered and incorporated under California

27  law and is a recipient of federal and state financial assistance.  SCUSD's responsibilities include

28

adopting policies and practices, and making and implementing administrative decisions for the schools and students within its jurisdiction.

24.     Defendant Jorge A. Aguilar ("Defendant Aguilar") is the Superintendent of SCUSD.  Defendant Aguilar is appointed by the SCUSD Board of Education to implement policies created by the Board of Education and/or mandated by federal and state laws and regulations.  Defendant Aguilar is responsible for ensuring that children in SCUSD are provided equal access to public education programs and activities offered in SCUSD.  Defendant Aguilar is also responsible for ensuring that all eligible children with disabilities are provided access to education in integrated settings, including services, accommodations, and modifications, in compliance with federal and state laws and regulations.  Defendant Aguilar is sued in his official and individual capacity.

25.     Defendant Christine A. Baeta ("Defendant Baeta") is the Chief Academic Officer of SCUSD.  Defendant Baeta leads the SCUSD Academic Office, which guides the development and implementation of academic services in the district, including curriculum, instruction, assessment, and school improvement.  Additionally, Defendant Baeta is responsible for the professional development of administrative and teaching staff, and supervises the operational and academic management of SCUSD schools.  Defendant Baeta is sued in her official and individual capacity.

26.     Defendant Board of Education of the SCUSD ("Board of Education") is elected by the community to provide leadership and oversight of the District.  Among its many responsibilities, the Board of Education establishes a long-term vision for the District and establishes District policies, administrative regulations, and goals.  In addition, the Board of Education bears a fiduciary responsibility for the management and expenditure of public funds in a manner consistent with state and federal law that ensures all students, including students with disabilities and Black students with disabilities, have equal access to public education programs and services.  The Board of Education selects, appoints, and oversees the work of the District's Superintendent, Defendant Aguilar.  The Board of Education works with the District's

1   Superintendent to fulfill its major responsibilities.

2         27.     Defendants Jessie Ryan, Darrell Woo, Michael Minnick, Lisa Murawski, Leticia

3   Garcia, Christina Pritchett, and Mai Vang are the currently elected Members of the Board of

4   Education (collectively, "Board Member Defendants").  In their official capacities, they

5   individually and collectively bear the duties and responsibilities of the Board of Education as

6   described above.  They are sued in their official and individual capacities.

7         28.     Unless otherwise noted, Defendants Aguilar, Baeta, the Board of Education, the

8   Board Member Defendants, and SCUSD are collectively and interchangeably referred to as

9   "SCUSD," the "District," or "Defendants."

10   **LEGAL FRAMEWORK**

11         29.     As discussed above, since the landmark decision in *Brown v. Board of Education*

12   and the Congressional acts that followed, it has been plain that public education programs,

13   services, and facilities must be operated in a manner than ensures equal access for and inclusion

14   of all students, regardless of race or disability.

15         30.     Several federal and state laws work in concert to ensure that school districts fulfill

16   this promise of equality in California.  Section 504 and the ADA protect students with

17   disabilities from discrimination, exclusion, unequal treatment, and unequal access to education in

18   public schools.  Similarly, the Equal Protection Clause and Title VI protect students from

19   discrimination on the basis of race.  California Government Code section 11135 prohibits

20   agencies such as school districts from discriminating against persons on the basis of disability,

21   race, and other protected statuses.

22   ***Section 504 and Title II of the ADA***

23         31.     Congress enacted Section 504 and the ADA to directly address the discrimination

24   that people with disabilities face when they are unnecessarily excluded from public life, such as

25   the public school system, due to their disabilities.  *See Olmstead v. L.C.*, 527 U.S. 581, 599–601

26   (1999).

27         32.     Taken together, Section 504 and the ADA create a system of legal responsibilities

28

1   that are designed to ensure that students with disabilities are free from discrimination and have

2   equal access to a public education alongside their peers without disabilities.  To achieve these

3   mandates, school districts are required to: (1) identify, locate and comprehensively evaluate

4   every child living in the district who is suspected of having a disability; (2) for qualifying

5   students, offer special education, related aids and services, accommodations, and modifications

6   that "are designed to meet individual educational needs of [students with disabilities] as

7   adequately as the needs of [students without disabilities] are met;" (3) to the greatest extent

8   appropriate, educate students with disabilities in inclusive settings; (4) provide appropriate

9   services so that students with disabilities are not disciplined for disability-related behavior; (5)

10  provide appropriate services so that students with disabilities are not excluded from the regular

11  education environment through harassment or bullying; and (6) provide access to education free

12  from discrimination.  34 C.F.R. § 104.33; *see also* 29 U.S.C. § 794; 42 U.S.C. § 12101 *et seq.*;

13  34 C.F.R. Pt. 104; 28 C.F.R. Pt. 35.

**Section 504**

15      33.     Section 504 is a federal law that protects individuals with disabilities in programs

16  and activities that receive federal financial assistance. 29 U.S.C. § 794; 34 C.F.R. §§ 104.1,

17  104.4.  Section 504 states that "[n]o otherwise qualified individual with a disability in the United

18  States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be

19  denied the benefits of, or be subjected to discrimination under any program or activity receiving

20  Federal financial assistance . . ."  29 U.S.C. § 794(a).  Section 504 requires entities that receive

21  federal financial assistance to provide aids, benefits, and services to individuals with disabilities

22  in the most integrated setting appropriate to the individual's needs.  34 C.F.R. § 104.4(b)(2).

23  Section 504 prohibits these entities from using "criteria or methods of administration… that have

24  the effect of subjecting qualified [people with disabilities] to discrimination" on the basis of

25  disability.  *Id*. § 104.4(b)(4).

26      34.     Section 504 applies to all school districts that receive federal financial assistance.

27  29 U.S.C. § 794(b)(2); 34 C.F.R. § 104.31.  Section 504 requires that these school districts

28

provide students with disabilities with special education and related aids and services designed to meet the needs of students with disabilities as adequately as the school districts meet the needs of students without disabilities. *See* 34 C.F.R. § 104.33(a), (b)(1). Qualified students with disabilities must be given "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the [student's] needs." *Id*. § 104.4(b)(2).

35.     Under Section 504, school districts are required to provide qualified students with a "free appropriate public education." 34 C.F.R. §§ 104.33(a), .34(a). Before determining any educational placement, school districts must provide the student with a validated evaluation, administered by trained personnel. *Id.* § 104.35. Regardless of the nature or severity of the student's disability, school districts must ensure that the student is educated with peers without disabilities to the "maximum extent appropriate . . . unless . . . the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." *Id*. § 104.34(a).

**Title II of the ADA**

36.     Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a). Further, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R § 35.130(d). This means "a setting that enables individuals with disabilities to interact with [persons without disabilities] to the fullest extent possible." 28 C.F.R. pt. 35, App. B. Additionally, a public entity may not use "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3)(i).

37.     Congress enacted the ADA to provide a remedy for "discrimination against

1   individuals with disabilities [which] persists in such critical areas as . . . education." 42 U.S.C. §

2   12101(a)(3), (b).  Congress specifically found that "segregat[ion]" is a "form[] of discrimination

3   against individuals with disabilities." *Id.* § 12101(a)(2).  Consequently, Title II of the ADA

4   outlaws segregation of individuals with disabilities and other forms of discrimination against

5   individuals with disabilities in public services such as education.  *Id.* § 12132; 28 C.F.R. §

6   35.130.  Title II of the ADA requires public entities to administer their services, programs, and

7   activities in the most integrated setting appropriate to the needs of qualified individuals with

8   disabilities.  *See Olmstead*, 527 U.S. 581 (1999) (interpreting Title II of the ADA); *see also* 28

9   C.F.R. § 35.130(d).

10      38.     Title II of the ADA further requires that public schools provide children with

11   disabilities an equal educational opportunity.  *See* 28 C.F.R. § 35.130(b)(1)(ii).  Title II of the

12   ADA applies to all of the activities of school districts that provide public education.  School

13   districts are required to "make reasonable modifications" to their programs and services "when

14   the modifications are necessary to avoid discrimination."  28 C.F.R. § 35.130(b)(7)(i).

15   Therefore, a public school district violates the ADA by segregating students because of their

16   disabilities instead of making reasonable modifications that would enable such students to learn

17   in an integrated, general education environment.  *See* U.S. Dep't of Justice, Civ. Rights Div.,

18   *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of*

19   *the Americans with Disabilities Act and Olmstead v. L.C.* at 2 (June 22, 2011) (explaining that

20   the ADA's "integration mandate" requires public entities to "reasonably modify their policies,

21   procedures or practices when necessary to avoid discrimination").

22                                 ***Equal Protection Clause***

23      39.     The Fourteenth Amendment to the U.S. Constitution provides that "No State shall

24   . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const.

25   amend. XIV.  The Equal Protection Clause was created to prevent "official conduct

26   discriminating on the basis of race."  *Washington v. Davis*, 426 U.S. 229, 239 (1976).

27      40.     "[T]he opportunity of an education . . . where the state has undertaken to provide

28

1   it, is a right which must be made available to all on equal terms." *Brown v. Board of Educ.*, 347

2   U.S. 483, 493 (1954).  When a school district deprives a child of an equal education to those of

3   her peers, "[t]he inestimable toll of that deprivation on the social economic, intellectual, and

4   psychological well-being of the individual . . . make it most difficult to reconcile the cost or the

5   principle of a status-based denial of basic education with the framework of equality embodied in

6   the Equal Protection Clause."  *Plyler v. Doe*, 457 U.S. 202, 222 (1982).

7       41.    The Equal Protection Clause's prohibition on segregation in public education

8   must be considered "in the light of its full development and its present place in American life

9   throughout the Nation."  *Brown v. Board of Educ.*, 347 U.S. 483, 492-493.

10                                  ***Title VI***

11      42.    Title VI of the Civil Rights Act of 1964 provides that recipients of federal

12   financial assistance may not discriminate on the basis of race, color, or national origin.  42

13   U.S.C. § 2000d.  The statutory text of Title VI bars intentional discrimination on the basis

14   of race, color, or national origin. *See Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582,

15   607–08 (1983); *Alexander v. Choate*, 469 U.S. 287, 292–93 (1985).  This prohibition extends to

16   recipients of federal financial assistance through the U.S. Department of Education, such as

17   public school districts.  34 C.F.R. §§ 100.1, 100.3.

18      43.    Title VI ensures that students should not experience a "racially hostile

19   environment," one in which racial harassment is "severe, pervasive or persistent so as to interfere

20   with or limit the ability of an individual to participate in or benefit from the services, activities or

21   privileges provided by the recipient." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022,

22   1033 (9th Cir. 1998); *see also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

23      44.    In passing Title VI, Congress specifically sought to end federal financial

24   assistance to segregated institutions, including segregated schools.  Representative Emanuel

25   Celler, Chairman of the House Judiciary Committee at the time of the passage of Title VI, stated,

26   "The enactment of [T]itle VI will serve to override specific provisions of law which contemplate

27   Federal assistance to racially segregated institutions."  110 Cong. Rec. 2467 (1964) (quoted in

28

1  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 330-31 (1978) (opinion of Marshall, J.).

2  Congress viewed Title VI as a way to implement *Brown v. Board of Education*'s prohibition on

3  segregation: Senator Hubert Humphrey, a leading sponsor of the Civil Rights Act of 1964,

4  identified ending federal grants to racially segregated institutions to conform with *Brown* as a

5  primary purpose of Title VI.  110 Cong. Rec. 6544 (1964).

6  *California Government Code Section 11135*

7     45.     California Government Code section 11135 prohibits discrimination against

8  persons on the basis of race, sex or disability and other protected statuses in state-run or state-

9  funded programs and activities.

10     46.     Regulations promulgated pursuant to California Government Code section 11135

11  provide, in relevant part, that "[i]t is a discriminatory practice for a recipient… (i) to utilize

12  criteria or methods of administration that . . . (1) have the purpose or effect of subjecting a

13  person to discrimination on the basis of ethnic group identification, religion, age, sex, color, or a

14  physical or mental disability[.]"  Cal. Code Regs. tit. 2, § 11154.

15     47.     SCUSD's operation of schools within the District and its administration of

16  educational services within those schools are subject to California Government Code section

17  11135(a) because they constitute a program or activity which is funded directly by the State of

18  California or receive financial assistance from the State.

19     48.     California Government Code section 11139 provides that the anti-discrimination

20  provisions of California Government Code section 11135 *et seq.*, and the regulations adopted

21  pursuant thereto, "may be enforced by a civil action for equitable relief, which shall be

22  independent of any other rights and remedies."  Plaintiffs therefore have the right to bring a civil

23  action for injunctive relief to enforce the rights guaranteed to them under California Government

24  Code section 11135 and the regulations promulgated thereunder.

25  **FACTUAL ALLEGATIONS**

26  *Defendants' Unlawful Policies and Practices*

27     49.     On information and belief, Defendants fail to implement legally compliant

28

1  policies, procedures, and programs with respect to students with disabilities who require

2  services, accommodations, and modifications to access education in the general education

3  curriculum.  SCUSD's failure to implement legally-compliant policies, procedures, and

4  programs results in SCUSD discriminatorily segregating students with disabilities, particularly

5  Black students with disabilities, at rates significantly higher than both statewide and national

6  averages.

7        50.      Upon information and belief, SCUSD places nearly half of its students with

8  disabilities in segregated placements.  These segregated placements include nonpublic schools,

9  which are segregated schools only attended by students with disabilities, and special day classes,

10  which are segregated classrooms that only serve students with disabilities.  The District operates

11  special day classes on both general education campuses that otherwise appear superficially

12  integrated and at least one fully segregated public campus that enrolls only students with

13  disabilities.

14        51.      In addition, according to the National Center for Education Statistics, only 2.9

15  percent of students with disabilities nationwide are educated in separate schools for students with

16  disabilities.  SCUSD, in contrast, regularly places approximately five percent of its students with

17  disabilities in nonpublic schools and another one percent of its students with disabilities on its

18  standalone, fully segregated public campus called the John Morse Therapeutic Center ("John

19  Morse").  Taken together, SCUSD places approximately six percent of its students with

20  disabilities in separate schools each year – a rate that is more than twice the national average.

21        52.      Similarly, in SCUSD, students with Autism are more than three times as likely as

22  students with Autism nationwide to be educated in segregated schools.  And, students who have

23  an Intellectual Disability are twelve times as likely to be educated in segregated schools as

24  similarly situated students nationwide.  Furthermore, upon information and belief, students who

25  have emotional and mental health disabilities are segregated at staggering rates, with SCUSD

26  educating almost none of these students in the regular education environment for at least eighty

27  percent of the school day.

28

1    53.    These failures are exacerbated for Black students with disabilities.  The District

2  disproportionately labels Black students with disabilities as having emotional and mental health

3  disabilities, and Black students are even more likely than other students with disabilities to

4  experience segregation.  For example, during the 2017-18 school year, almost thirty-eight

5  percent of the students at John Morse and thirty-one percent of the students placed at nonpublic

6  schools were Black, even though Black students were less than sixteen percent of the District's

7  student population and less than twenty percent of all students with disabilities. Overall, Black

8  students with disabilities are 1.9 times more likely than other students with disabilities in

9  SCUSD to be placed in segregated settings.

10    54.    Despite the concerns expressed by the 2017 independent audit regarding the

11  District's overuse and ineffective use of segregated placements, upon information and belief,

12  SCUSD has not reformed its practice related to the use of these segregated placements.  In fact,

13  upon information and belief, SCUSD has increased its use of segregated placements, with the

14  number of special day classes increasing by over ten percent since 2017.  Further, SCUSD has

15  failed to leverage the funds it expends on segregated schools and placements to, instead, provide

16  students with non-discriminatory access to education in the general education environment.

17    55.    SCUSD's segregation of students with disabilities, particularly Black students

18  with disabilities, causes these students ongoing harm.  Because Defendants fail to provide

19  students with disabilities, particularly Black students with disabilities, access to the same

20  educational opportunities as their peers, these students fall further and further behind.  For

21  example, upon information and belief, only six percent of students at John Morse met or

22  exceeded the standards of the California Assessment of Student Performance and Progress for

23  the 2017-18 academic year.

24    56.    Compounding this harm is the District's refusal to provide students with

25  disabilities in segregated settings access to the full range of academic services, supports and

26  course offerings provided to other students in SCUSD.  For example, the students at John Morse

27  are not instructed in music, art, sports, health, and foreign languages.  Unlike other elementary

28

and middle-school students in general education programs in SCUSD, the District does not provide students at John Morse students with tutoring, college readiness and preparation programs like Advancement Via Individual Determination (AVID) and Math, Engineering, Science Achievement (MESA) programs, enrichment programs, or the services of academic counselors, library media teachers, social/behavior or career development counselors, or staff speech and language specialists.  The District's discriminatory denial of access to these curricular offerings to students with disabilities at John Morse exacerbates their segregation.

57.     Additionally, the District contracts with segregated nonpublic schools that also do not provide students with disabilities with access to the range of curricular offerings that their peers without disabilities receive.  Upon information and belief, high school students in SCUSD who are placed in segregated schools do not receive access to a college-preparatory curriculum. Nor do these students have access to the full range of course offerings, such as foreign language courses, that their non-disabled peers can access in the general education environment.  Upon information and belief, these students also do not have equal access to career and technical education curriculum as their peers without disabilities.

58.     SCUSD Students placed in nonpublic schools, particularly Black students, are more likely to dropout.  For example, in 2016-17, the dropout rate for District students placed in nonpublic schools was eight percent which far exceeded the District, County, and State dropout rates of two percent, three percent and two percent, respectively.  Worse, Black students in nonpublic schools had a nine percent dropout rate.  Additionally, few of the students in nonpublic schools who make it to the twelfth grade graduate.  In 2016-17, twelfth grade students who attended District school sites enjoyed a graduation rate of almost eighty-three percent; students placed in nonpublic schools had an 8.2 percent graduation rate.  Only seven SCUSD students graduated from a nonpublic school in 2016-17, and none of the students graduated having completed the required coursework for UC/CSU admission.  In fact, between the 2007-08 and 2016-17 school years, only *one* SCUSD student with a disability has graduated from a nonpublic school having completed UC/CSU required coursework.

59.     As alleged *infra*, the District's placement of students with disabilities in segregated placements also subjects them to unnecessary and traumatic restraint and seclusion. Neither restraints nor seclusion have been shown to have any educational benefit, and, instead, have been shown to cause both physical and psychological harm to students.

60.     Even the students with disabilities who are not placed in segregated settings experience the harms of segregation through the District's policies that lead to excessive use of exclusionary discipline.  This is especially true for Black students with disabilities.  Students who experience exclusionary discipline lose instructional opportunities, are more likely to have decreased school connectedness and have reduced opportunities for pro-social development. Over time, the cumulative effect of exclusionary discipline can disengage students from their education, risking further negative outcomes for these students.

**District Policies that Deny Timely Identification and Evaluation**

61.     Defendants have failed to put into effect policies, procedures, and programs that ensure that all students with disabilities who require services, accommodations, and modifications to remain in the general education environment are timely identified, located, and evaluated.  Instead, Defendants have created policies and practices that result in illegal delay of evaluations, despite parental requests.

62.     The District has created a number of gate-keeping mechanisms, both for general evaluation as well as for specialized assessments.  Upon information and belief, these gate-keeping teams serve to illegally restrict the number of students who receive assessment and to illegally delay those assessments for students who do receive them, particularly for Black students with disabilities.

63.     These gate-keeping mechanisms include the District-created "Student Study Team."  Upon information and belief, in response to parental requests for evaluations, Defendants require students and parents to participate in the District-created Student Study Team process.  The Student Study Team process is an unnecessary extra series of meetings that, at its best, delays what should be a timely assessment and, at its worst, completely denies appropriate

1   assessment.  Upon information and belief, Student Study Teams have access to no specialized

2   services that could legally be provided in lieu of an assessment for a student with a disability.

3   Upon information and belief, Student Study Teams do not provide parents and students with any

4   description of assessment processes or of their procedural rights to assessment.

5            64.      These gate-keeping mechanisms also include specialized assessment teams such

6   as the educationally-related mental health services team and the Autism team.  Upon information

7   and belief, these structures, created by Defendants, delay and restrict the number of students who

8   receive these evaluations.

9            65.      Upon information and belief, the District has not staffed these specialized

10   assessment teams in a way that could possibly meet the need for assessment within the District.

11   A referral to one of these assessment teams functions as a referral to wait for available staff.  For

12   example, Defendants require an assessment by a school social worker as part of the

13   educationally-related mental health services team assessment.  However, upon information and

14   belief, during the 2018-19 school year, Defendants only employed eight social workers for the

15   entire school district, which serves more than 45,000 students across seventy schools.  Upon

16   information and belief, Defendants do not have a sufficient number of trained and/or qualified

17   staff to conduct these evaluations, which results in many of these evaluations being illegally

18   delayed.

19            66.      Long delays in merely getting evaluated deny children who need services,

20   accommodations, and modifications access to education in the general education environment.

21   They also place these children at increased risk of placement in a segregated setting due to lack

22   of timely and appropriate interventions.

23            67.      The District has a policy of not providing parents and students with accurate

24   information regarding their rights to assessment, despite the District's knowledge that its own

25   staff both act upon misinformation and convey that misinformation to families.  The District has

26   a policy of not providing parents and students with information regarding assessments even after

27   the District learns that a student has a disability.  Upon information and belief, the District does

28

1  not have any process to review school-site parent/student handbooks in the District to ensure that

2  parents and students receive information about seeking assessments, nor does the District have

3  any other systemic way to ensure that parents and students are provided accurate information

4  about assessments.  On the contrary, misinformation about assessment is rampant through the

5  District.  For example, the 2017 independent audit revealed that some District staff believed that

6  they had to suspend students before students could receive assessment, which, on information

7  and belief, disproportionately harms Black students with disabilities.  Yet the District has failed

8  to take the most basic steps to ensure that parents and students understand their right to request

9  assessments.

10  **District Policies that Deny Students Necessary Services, Accommodations, and**

11  **Modifications in the General Education Environment**

12  68.    Districtwide, Defendants have failed to create a sufficient number of appropriate

13  inclusive placements for students with disabilities.  Defendants have failed to structure the

14  SCUSD programs and its resources so that services, accommodations, and modifications are

15  available to students with disabilities in integrated placements.  Consequently, SCUSD

16  segregates students with disabilities who could be appropriately educated in the general

17  education environment.

18  69.    Upon information and belief, Defendants have maintained woefully inadequate

19  staffing levels and systematically fail to provide staff with training and oversight to ensure that

20  students with disabilities receive sufficient individualized services, accommodations, and

21  modifications to support their inclusion in the general education environment.  For example,

22  during the 2018-19 school year, SCUSD had only one staff member who was qualified to serve

23  as an inclusion specialist, eight social workers, and seven behavior intervention specialists for

24  the entire District.  As a consequence, students are not offered and do not receive appropriately

25  intensive services, accommodations, and modifications to allow students to access education in

26  the general education environment.

27  70.    For example, Defendants fail to provide students with social, emotional,

28

1  behavioral, and/or mental health needs access to appropriately intensive services,

2  accommodations, and modifications such as educationally-related mental health services, direct

3  behavior support, functional behavioral assessments, behavior intervention plans, individual

4  counseling, social skills services, social work services, and psychological services.  Defendants'

5  failure to provide these services in the general education environment significantly contributes to

6  the segregation of students with disabilities, especially Black students with disabilities.

7      71.    The District has maintained its policy of inadequate staffing despite knowledge

8  that general education teachers reported that they could not adequately serve students with

9  disabilities.  Upon information and belief, in 2019, the Sacramento City Teachers Association

10  negotiated with the District to apply cost savings from cuts to teachers' healthcare toward

11  increased supports for students with disabilities, including hiring more psychologists and

12  behavior intervention specialists.  However, also upon information and belief, the District

13  reneged on this agreement and never hired additional staff to support students with disabilities.

14      72.    Defendants additionally fail to provide students with disabilities with sufficient

15  access to specialized related services such as augmentative and alternative communication or

16  assisted technology.  Upon information and belief, the District does not make these services

17  available to students in the general education environment.  Instead, the District instructs parents

18  to seek these services through their medical provider.

19      73.    Despite knowledge of effective services and supports to provide students with

20  disabilities non-discriminatory access to education in the general education environment,

21  Defendants have failed to adopt these measures.  Defendants ignored recommendations from the

22  2017 independent audit to develop an "Inclusive Education Vision," and failed to implement the

23  audit's recommendations for inclusive education practices, such as the Multi-Tiered Systems of

24  Support framework.  The audit further found that SCUSD had not created sufficient tools for

25  inclusive practice in the general education environment.  Upon information and belief, despite

26  the audit's concerns and recommendations directed at the District, Defendants have failed to

27  implement inclusive education throughout SCUSD, nor provide staff meaningful or effective

28

1  training or levels of resources on inclusive education.

2      74.     Upon information and belief, despite knowledge that lack of staff training has led

3  to discrimination for Black students with disabilities, Defendants systematically fail to provide

4  staff with sufficient training and support on cultural and linguistic responsiveness, or other

5  approaches to working with students that validate and affirm their home culture and language to

6  promote their social, emotional, and academic success.  When incorporated in the classroom,

7  culturally and linguistic responsiveness enables school staff, including teachers, social workers

8  and school psychologists, to better understand the motivations and behavior of students so that

9  they can rely less on exclusionary discipline and more on, where needed, appropriate services.

10  SCUSD's failure to employ culturally relevant teaching, or similarly effective approaches,

11  significantly contributes to SCUSD's wholly inadequate provision of services to students with

12  disabilities, particularly Black students with disabilities, leading to further isolation and

13  segregation.

14      75.     Due to SCUSD's failure to provide appropriate services in the general education

15  environment, many students with disabilities, particularly Black students with disabilities are

16  discriminatorily excluded from educational opportunities and instructional time.  Ultimately, due

17  to SCUSD's failure to provide appropriate services in the general education environment, many

18  students with disabilities, particularly Black students with disabilities, are segregated from their

19  peers.

20                  **District Policies that Result in Discriminatory Discipline**

21      76.     Defendants further segregate students with disabilities through inappropriate

22  exclusionary discipline.  Because SCUSD fails to provide these students with appropriate

23  services, accommodations, and modifications, students continue to struggle with their disability-

24  related behaviors.  In response, SCUSD punishes its students with disabilities and overly relies

25  on time outside of the classroom, suspensions, and expulsions, which denies students with

26  disabilities, particularly Black students with disabilities, access to educational opportunities.

27      77.     The District's written student discipline board policy and administrative

28

regulation, adopted in June 2014 in collaboration with the Black Parallel School Board, purport to "avoid disparate application and treatment."  However, the District, despite being aware of the discrimination rampant in its schools, has engaged in a widespread policy of non-enforcement of its own written policy.  Consequently, discrimination remains entrenched in the District's disciplinary practices.

78.    The District's Board Policy 5144 requires the Superintendent to "collaboratively develop a Discipline Matrix with stakeholders that shall be used to guide the actions of all school site leaders with regards to when out-of-school suspension or an expulsion referral can be utilized for certain offenses."  The Board Policy directly ties this discipline matrix to the goal of "minimizing the excessive use of willful defiance as a reason to impose in-school and off-campus removals that often lead to poor educational outcomes…."  However, upon information and belief, the District has not adopted a discipline matrix to meet this goal.

79.    The District's Board Policy 5144 further requires that the Superintendent present to the Board an annual plan that will ensure mandatory professional development for "all district employees" in areas including restorative practices, social and emotional learning, implicit bias, and cultural proficiency.  Upon information and belief, the Superintendent has not created such a plan, and has not mandated such training for all District employees, despite knowledge that such training was necessary to address race- and disability-based discrimination in the District's schools.

80.    On paper, the District's administrative regulations mandate that each school create an "Annual Site Action Plan," based on a framework that the District would provide to schools, for reducing "suspensions/disproportionality" and improving "school climate through the use of restorative practices."  However, upon information and belief, subsequent to the adoption of this administrative regulation, the District entered into a memorandum of understanding with its teachers' union which prohibits the implementation of these plans.  Upon information and belief, the District has not provided schools with the framework for the Annual Site Action Plans, nor has any school in the District created an Annual Site Action Plan on its

1    own.

2        81.    The District's administrative regulations also mandate that the District provide the

3    school sites with disaggregated data to inform necessary reforms.  Administrative Regulation

4    5144 states:

5        The District's administrative regulations also mandate that the District provide the
         school sites with disaggregated data to inform necessary reforms.  Administrative
6        Regulation 5144 states: The District office will provide all school sites with data
         concerning suspensions and expulsions at the site on a monthly basis.  This data
7        shall include statistics concerning: race, ethnicity, gender, SES, EL/LEP, students
         with disabilities, location, time, grade, type of infraction, duration of suspension,
8        and may also include other relevant data.  The data shall be analyzed by the site
         team on a monthly basis by utilizing the District provided Data Discussion Guide.
9        The Data Discussion Guide is a resource for assisting with the analysis of
         discipline trends and creating the Monthly Action Plans (MAPs).  The school
10       site's data analysis and MAPs shall be evaluated by the District twice annually;
         on or before December 1 and May 1, of each school year.
11       82.

12   Upon information and belief, the District has not provided school sites with this data, nor has it

13   evaluated any Monthly Action Plans created by school sites.

14       83.    Upon information and belief, the District has a policy of not tracking and

15   recording all disciplinary exclusions.  Students with disabilities receive a variety of informal

16   disciplinary removals that are not tracked as suspensions by the District.  These informal

17   removals include parents being called to pick up their students from school, students being sent

18   to sit in an office without access to educational instruction, and students being sent to sit in the

19   hallway without access to educational instruction.  The District's policy is to not track these

20   informal removals as discipline.  As a consequence, the District does not provide students with

21   disabilities who experience informal removals with evaluations before disciplinary changes in

22   placement.

23       84.    Moreover, upon information and belief, the District has a policy of not providing

24   students with disabilities who experience formal disciplinary removals with evaluations before

25   disciplinary changes in placement in a lawful and timely manner.  As a result of this policy,

26   students with disabilities have been placed in segregated school settings without regard to the

27   relationship between the behavior subject to the disciplinary action and their disability.

28

85.     Upon information and belief, the District has a policy of suspending students enrolled in kindergarten through third grade for willful defiance and/or creating an intimidating or hostile environment, in violation of state law prohibiting such suspensions for students in kindergarten through third grade.  During the 2017-18 school year, students with disabilities in kindergarten through the third grade were suspended on the basis of willful defiance at twice the rate of all District students, while Black students with disabilities were suspended on the same ground at five times the rate of all District students.  In that same year, upon information and belief, students with disabilities in kindergarten through third grade were suspended on the basis of creating an intimidating or hostile environment at twice the rate of all District students, while Black students with disabilities were suspended at eight times the rate of all District students.  As a result of this policy, students with disabilities, particularly Black students with disabilities, are unable to access critical support services, academic instruction and social integration with their peers at a young age when such services and experiences are particularly critical to students' social-emotional development and access to education.

86.     Upon information and belief, the District has a policy of not providing students with disabilities access to education during periods of disciplinary exclusion.  Due to the lack of access to education, students with disabilities fall further behind their classmates during disciplinary exclusions.  Black students with disabilities suffer the greatest lack of access to education since, as described below, they bear the brunt of the District's discriminatory overuse of exclusionary discipline.

87.     These failures result in the inappropriate use of exclusion from school in response to student behaviors, disproportionately impacting students with disabilities, particularly Black students with disabilities.

88.     Upon information and belief, during the 2018-19 school year, students with disabilities were significantly more likely to receive an out-of-school suspension than their peers without disabilities.

89.     Figure 1 shows the contrast between the rate of suspensions for students with disabilities and their peers without disabilities, as reported to the California Department of Education for school years 2016-17 and 2017-18.  During both school years, the rate of suspension for students with disabilities was approximately twice as high as for students without disabilities.



Figure 1: Students with Disabilities Compared to Students without Disabilities Suspension Rates

90.     The inappropriate use of removals is worse for Black students with disabilities. Upon information and belief, during the 2018-19 school year, Black students received at least forty percent of total suspensions within SCUSD, although they comprised only fourteen percent of the student population.[3]  That year, upon information and belief, Black students with disabilities were more than ten times more likely than other students with disabilities to be suspended.  Similarly, upon information and belief, they were almost ten times more likely than their non-Black peers without disabilities to be suspended.  Moreover, upon information and belief, Black students with disabilities were more than fifteen times more likely than their White peers without disabilities to receive an out-of-school suspension.

_____
[3] All suspension data for the 2018-19 school year included herein is based on total numbers of suspension rather than unduplicated counts and is upon information and belief.

91.     Figure 2 displays the significant divergence between the suspension rates of Black students with disabilities and their White peers without disabilities for school years 2016-17 and 2017-18 as reported by the California Department of Education.  In both school years the suspension rate for Black students with disabilities was approximately ten times as high as the rate for their White peers without disabilities.



92.     Black students with disabilities face an even greater risk of suspension under highly subjective and discretionary categories like "willful defiance" and "created intimidating or hostile environment."  Such offense categories are susceptible to implicit and explicit biases; educators are more likely to view ambiguous behavior as more hostile when performed by Black rather than White actors.[4]  Thus, highly discretionary and subjective offenses can be expected to result in disparate outcomes for Black students when districts fail to mitigate this risk.

---

[4] *See* Kurt Hugenberg & Galen V. Bodenhausen, *Facing Prejudice: Implicit Prejudice and the Perception of Racial Threat*, 14 Psychol. Science 640, 643 (Nov. 2003), available at https://www.frontiersin.org/articles/10.3389/fpsyg.2017.00519/full; Anthony Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L. Rev. 155, 222-24 & n.337 (2005) (collecting studies showing that "that people will assign different significance to identical actions depending on the actors' race").

93.     As a result of these failures, during the 2018-19 school year, upon information and belief, Black students were at least five times more likely than their peers to receive an out-of-school suspension for willful defiance.  Upon information and belief, Black students with disabilities faced an even greater risk of suspension and were approximately three times more likely than other students with disabilities and approximately fifty times more likely than their White peers without disabilities to receive an out-of-school suspension for willful defiance.  Upon information and belief, Black students were approximately six times more likely than their White peers to receive an out-of-school suspension for behavior categorized as "created an intimidating or hostile environment."  Upon and information and belief, Black students with disabilities were approximately two times more likely than other students with disabilities and approximately twenty times more likely than their White peers without disabilities to receive an out-of-school suspension for "created an intimidating or hostile environment.



94.     Figure 3 compares four student groups: all Black students, all White students, Black students with disabilities, and White students without disabilities for school years 2016-17

1  and 2017-18.  As reported by the California Department of Education, during both school years,

2  the rate of suspension for all Black students was significantly higher than the rate for all White

3  students – about eight times higher.  Black students with disabilities were suspended at a rate

4  approximately fifteen times higher than their White peers without disabilities in 2016-17 and

5  approximately twenty-three times higher in 2017-18.

6  <strong>District Policies that Deny Students a Safe Learning Environment</strong>

7  95.   Defendants have failed to provide a safe and non-discriminatory learning

8  environment for students with disabilities, particularly Black students with disabilities.

9  96.   The District, despite being aware of the bullying and harassment in its schools,

10  has engaged in a widespread policy of non-enforcement of its own written Board policy around

11  school-site safety planning.  Taken together, Board Policy 0450 and Administrative Regulation

12  5145.5 require that each SCUSD school site create a "Comprehensive Safety Plan" with an

13  attached "bullying prevention plan" and update those plans on an annual basis.  The Board is

14  required to review and approve each school's Comprehensive Safety Plan.  Upon information

15  and belief, the Board has not reviewed and approved any SCUSD school site's Comprehensive

16  Safety Plan that includes the required bullying prevention plan.

17  97.   Defendants have failed to hire sufficient trained staff to effectively remedy

18  disability-based harassment of students with disabilities and race-based harassment of Black

19  students with disabilities within District schools.  For example, during the 2018-19 school year,

20  the District only employed one anti-bullying specialist for the entire District.  Upon information

21  and belief, the District has offered no effective training to address bullying and harassment based

22  on race or disability.  Consequently, even when SCUSD school staff respond to reports of

23  harassment, they routinely suggest strategies for addressing it that are not culturally responsive,

24  are counter-productive, or put a large burden on the students who have been harassed.  Further,

25  SCUSD staff fail to create, maintain, monitor, update, and/or follow safety plans for students

26  who have been bullied or harassed on the basis of disability or race.

27  98.   Defendants have also failed to ensure that parents and students have sufficient

28

1  information about reporting complaints of disability- or race-based harassment.  The District

2  points to its "Title IX officer" as the proper official to investigate such complaints.  Title IX of

3  the Education Amendments of 1972, 20 U.S.C. §§ 1681-88, is a federal law designed to end sex-

4  based discrimination in federally funded programs.  The District's own website states that the

5  Title IX "District compliance officer will investigate any complaints of harassment or

6  discrimination based on gender equity issues for student to student."  Upon information and

7  belief, there is no information on the District's website that would suggest that a family should

8  make a complaint of disability- and/or race-based harassment to the District's Title IX officer.

9  The District has consequently failed to structure its reporting mechanism for disability- and race-

10  based harassment in a way that would allow parents and students to access it.

11        99.     Defendants have failed to monitor and provide oversight to ensure that students

12  who have experienced disability-based or race-based bullying and harassment are not forced to

13  transfer schools.  Upon information and belief, Defendants do not track transfers of students

14  within the District that resulted after the student or parent requested intervention with bullying or

15  harassment.  Due to the lack of training on effective strategies to address bullying and the lack of

16  oversight, SCUSD school staff have pressured the families of these students to agree that the

17  student should transfer schools.  Consequently, for at least some students with disabilities, they

18  transfer schools multiple times before they even reach middle school.  As a result, the disruption

19  in education further denies these students access to education.

20        100.    After SCUSD places students in segregated settings, these students experience

21  additional harm from the unnecessary use of traumatic interventions such as restraints and

22  seclusion of students rather than positive behavioral interventions, services and supports.  Upon

23  information and belief, Black students with disabilities experience this harm at significantly

24  greater rates than other students.

25        101.    Upon information and belief, the District continues to contract with segregated

26  placements that unnecessarily rely upon traumatic restraints and seclusion of students rather than

27  positive behavioral interventions, services and supports.  Upon information and belief, students

28

1   who are placed by SCUSD in segregated placements are more likely to experience seclusion and

2   restraint than students in the general education environment.  Upon information and belief, for

3   similar behaviors, Black students are more likely to experience seclusion and restraint than

4   White students.  Upon information and belief, in recent school years, Black students in

5   segregated settings were significantly more likely than White students to be restrained and

6   secluded for "out of seat/ disruptive behavior."  Black students were also significantly more

7   likely than White students to be restrained and secluded for behavior described as "student

8   frustrated or agitated."  Upon information and belief, Black students who were placed in

9   segregated settings by SCUSD were significantly more likely to experience physical restraints

10   than other students.  Upon information and belief, when White students were restrained, they

11   were significantly more likely than Black students to receive an escort restraint, a less traumatic

12   form of restraint than a physical restraint.

13         102.    The District's policy of contracting with segregated placements that unnecessarily

14   rely upon restraints and seclusion, denies students with disabilities, particularly Black students

15   with disabilities, access to a safe learning environment and consequently denies access to

16   education.  The trauma caused by these interventions, upon information and belief, compounds

17   the harm of segregation for these students.

18                      ***Plaintiff Facts***

19                  **Black Parallel School Board**

20         103.    Plaintiff Black Parallel School Board is a community-based membership

21   organization developed to serve Black children, primarily those attending SCUSD.  It is an

22   unincorporated association located in Sacramento, California and is governed by a member-

23   elected and member-run Executive Council.

24         104.    The BPSB's primary responsibility is to support the educational growth and

25   achievement of Black students by monitoring all educational activities and programs of SCUSD

26   to ensure that they are compatible with the needs of Black students in the district.  BPSB

27   primarily focuses on promoting and advocating for Black student achievement and educational

28

1    quality and attainment, and classroom and District practices that are supportive and culturally

2    relevant as opposed to those that punish and exclude Black children.

3         105.    One of BPSB's primary activities is to monitor school sites and the district as a

4    whole, and to publish their findings in an annual report that informs BPSB advocacy efforts.

5    BPSB's other primary activities are to advocate and help parents and children in the District

6    advocate for themselves before the School Board and in other school forums, provide trainings

7    for parents and educators, and to coordinate with and support other Black-student focused

8    advocacy groups throughout the Sacramento region and Central Valley of California.  BPSB also

9    regularly provides and connects SCUSD students to education scholarships and provides support

10   services to parents regarding school discipline and academic performance.

11        106.    BPSB has approximately 150 members including parents of Black students with

12   disabilities who reside within the District, attend a wide array of schools, and are not receiving

13   adequate, necessary, and appropriately individualized services, accommodations, and

14   modifications.  Instead, children of BPSB's members experience high rates of exclusionary

15   discipline, segregated and restrictive placements, discrimination, and harmful and hostile school

16   environments.

17        107.    BPSB has diverted resources away from their primary activities in order to

18   mitigate the District's unlawful policies and practices.  Executive Council members have

19   attended meetings as advocates on behalf of their members, conducted classroom observations to

20   investigate members' complaints regarding the education of students with disabilities, and

21   identified referrals for members requiring legal assistance.  For example, since January 2017,

22   BPSB has attended nearly twenty meetings on behalf of members after members complained that

23   their children were not receiving the services, accommodations, and modifications they needed.

24   The BPSB was not formed to provide these types of supportive services and does not receive

25   funding to provide these services.

**Individual Plaintiffs**

27        108.    Student Plaintiffs S.A., K.E., and C.S. are all school-aged children who reside

1    within the boundaries of SCUSD.  No two Student Plaintiffs currently attend or have attended
2    the same schools within the District.

3        109.    Each Student Plaintiff has known disabilities that impair one or more of his or her
4    major life activities under Section 504 and the ADA, including, but not limited to, the activity of
5    learning.

6        110.    All of the Student Plaintiffs are either Black or mixed-race Black.  As discussed
7    below, each of the Student Plaintiffs have experienced discrimination, segregation (including
8    exclusionary discipline), and unequal educational opportunities that are illustrative and
9    symptomatic of the District's unlawful and discriminatory policies, as outlined above.

10        111.    Unless and until the Defendants' address the problems outlined herein, the
11    Student Plaintiffs will be unable to be free from discrimination and receive the equal access to
12    their public education in the integrated and inclusive school setting to which they are entitled.

13                                                    *S.A.*

14        112.    S.A. is a ten-year-old student who attends a K-8 school operated by SCUSD.
15    S.A. is a fifth-grade student.

16        113.    S.A. enjoys playing basketball, watching his favorite athletes, and sketching.  S.A.
17    lives with his mother, Amy A., and siblings within the boundaries of the District.

18        114.    S.A. has been diagnosed with Autism Spectrum Disorder and Anxiety Disorder.
19    S.A. is a qualified individual with a disability under Section 504 and the ADA.

20        115.    S.A. is one of fewer than two dozen Black students remaining at his public
21    school.  Although Black and White students each make up approximately fifteen to seventeen
22    percent of the District's overall enrollment each year, Black enrollment at S.A.'s school has
23    dropped below five percent whereas White student enrollment now accounts for nearly two-
24    thirds of the school's student body.  Upon information and belief, all academic staff at S.A.'s
25    school are also White.

26        116.    The District has failed to provide S.A. with appropriate mental health, behavioral,
27    or social evaluations, nor has the District provided him the services, accommodations, and

28

1   modifications that would allow him to be successful in the general education environment.  In

2   addition, upon information and belief, none of the teachers at S.A.'s school is credentialed to be

3   a primary instructor for students with Autism Spectrum Disorder.

4       117.    S.A. is not provided with equal access to the instruction, programs, and services

5   available to other students at his school.  For example, S.A. is frequently removed from his class

6   during core parts of the curriculum.

7       118.    To date, S.A. has not received culturally relevant and responsive education,

8   programs, and services while attending a District school.

9       119.    Instead of providing these services, supports, and equal access at S.A.'s

10  neighborhood school, the District has recommended that S.A. be removed to a more segregated

11  placement and has repeatedly excluded S.A. from his classroom.

12      120.    Upon information and belief, S.A. has been removed from class without

13  documentation on more than eighty occasions since he started first grade at his K-8 school.

14      121.    During the 2018-19 school year, S.A. was excluded from his class on at least 23

15  school days – the equivalent of more than four weeks of school.  S.A. was formally suspended

16  from school for seven of those days.  In addition, S.A.'s classroom teacher sent S.A. home or to

17  another room on at least sixteen other occasions.

18      122.    Upon information and belief, the District did not document or track S.A.'s sixteen

19  additional removals from school during the 2018-19 school year.  These additional removals

20  typically occurred at the beginning of the school day and lasted for the remainder of the day.  He

21  was typically sent out without any school work and deprived of any school instruction.  The

22  District did not document or track removals not resulting in formal suspension, and thus failed to

23  recognize that S.A. had been removed for more than ten days of school during the 2018-19

24  school year.  Upon information and belief, S.A. did not receive any instruction or access to

25  education on his eleventh day of removal and beyond during the 2018-19 school year.

26      123.    Upon information and belief, all of these suspensions and informal removals

27  during the 2018-19 school year resulted from disability-related behavior or behavior related to

28

1  his response to experiencing identity-based bullying and harassment.  Nevertheless, the District

2  did not conduct a manifestation determination review or a Functional Behavior Assessment for

3  S.A..

4       124.  Upon information and belief, S.A. – the only known Black student with Autism

5  Spectrum Disorder at his school – was suspended and removed more than any other student in

6  the school during the 2018-19 school year.

7       125.  These excessive removals result in lost instructional time, hindering S.A.'s

8  academic progress.  On a school campus that lacks diversity in race and ability, such targeted and

9  persistent exclusion also stigmatizes S.A. and students like him, fostering an environment that is

10  unwelcoming and unaccommodating.

11       126.  S.A. is at constant risk of being removed from his public K-8 school and placed in

12  a segregated setting where he also will not have equal access to his public education and where

13  he is likely to be subjected to additional harms, such as a heightened risk of restraint and

14  seclusion.

15       127.  S.A. has been the repeated target of disability- and race-based biases and

16  stereotypes.  Despite his medical diagnosis of Autism Spectrum Disorder, school staff continue

17  to openly treat him as if he is a dangerous child to be feared.  For example, S.A.'s teacher locked

18  the classroom door and refused to let S.A. enter, telling the other students that they were on "lock

19  down" – a term that connotes fear and threats of violence in today's culture – and that they were

20  not to let S.A. inside the classroom.

21       128.  S.A. has endured severe and pervasive identity-based bullying and harassment at

22  school from both staff and students.  This has included, for example, other students calling S.A.

23  names like "stupid Black boy" and physically attacking S.A.. Despite notice, Defendants failed

24  to intervene in a timely or effective manner to ensure that S.A. has access to a safe educational

25  environment.  Defendants' actions and failures effectively endorse fear-based racial and

26  disability biases and discrimination.  These actions and failures have caused S.A. to feel afraid at

27  school and isolated from his peers, creating a hostile learning environment for S.A. and other

28

1  students and limiting S.A.'s access to benefits provided by the school.

2      129.    Upon information and belief, S.A.'s experiences are illustrative of and result from

3  the District's unlawful policies as outlined above.

4                                          *K.E.*

5      130.    K.E. is a sixteen-year-old student who has been placed by SCUSD in a nonpublic

6  school that exclusively serves students with disabilities.  K.E. is an eleventh-grade student.

7      131.    K.E. enjoys cooking and reading science-fiction novels.  He is interested in

8  learning about culinary arts and wishes he could participate in a Regional Occupational Program

9  or "ROP" at school.  K.E. wants to graduate with a regular high school diploma and would like

10 to be ready to attend college after graduation.

11     132.    K.E. has a history of trauma and has been diagnosed with various mental health

12 conditions.  K.E. is a qualified individual with a disability under Section 504 and the ADA.

13     133.    K.E. is Black.  He lives with his siblings and guardian, Jennifer E., within the

14 boundaries of the District.

15     134.    During the 2017-18 school year, K.E. attended the ninth grade at a public SCUSD

16 high school.  Although he was on a public campus, he was placed in a separate class for students

17 with disabilities for a majority of his school day.  The District failed to provide K.E. with

18 appropriate mental health, behavioral, or social evaluations, supports, or services that would help

19 him to be successful in the general education environment.  In addition, upon information and

20 belief, K.E. was not provided with equal access to the instruction and courses that were available

21 to other students without disabilities at his school.

22     135.    Additionally, K.E. did not receive culturally relevant and responsive education,

23 programs, and services while attending a District school that year.  K.E. also did not receive

24 trauma-informed services or instruction.

25     136.    Also during the 2017-18 school year, K.E. endured severe and pervasive identity-

26 based bullying and harassment at school from both staff and students.  K.E. was the target of

27 peers' homophobic, race-based, and disability-based slurs.  K.E. sought help from staff and was

28

1    directed to fill out the bullying and harassment form.  K.E. estimates that he submitted at least

2    two dozen forms that year but received no responses to those complaints.  The discrimination,

3    bullying, and harassment persisted, causing K.E. to feel unsafe, unprotected, and unsupported in

4    his school.  In addition, K.E.'s teacher placed a sign outside the classroom door that informed all

5    passing students and staff that the class was for "Emotionally Disturbed" students.  This sign

6    remained in place throughout the school year and was not removed by the District, despite its

7    violation of students' privacy and its further perpetuating biases and stereotypes about these

8    students.

9        137.    During the 2017-18 school year, K.E. was excluded from school on at least

10   twenty-two school days – the equivalent of more than four weeks of school.  K.E. was formally

11   suspended from school for eleven of those days.  In addition, K.E. was sent home or excluded

12   from school on at least eleven other occasions.  Upon information and belief, the District did not

13   document or track K.E.'s eleven additional removals from school during the 2017-18 school

14   year.  While removed from school, K.E. was deprived of any school instruction or school work.

15   Upon information and belief, K.E. did not receive any instruction or access to education on his

16   eleventh day of removal and beyond during the 2017-18 school year.

17       138.    Upon information and belief, all of these suspensions and informal removals

18   during the 2017-18 school year resulted from disability-related behavior or behavior related to

19   his response to experiencing identity-based bullying and harassment.  Nevertheless, the District

20   did not intervene appropriately or conduct a Functional Behavior Assessment.  Although the

21   District conducted one manifestation determination review in May 2018, it failed to return K.E.

22   to his school after determining that his alleged behavior was a manifestation of his disabilities.

23       139.    Instead of providing K.E. with services, accommodations, modifications, and

24   equal access at his neighborhood school, the District unilaterally removed K.E. from his public

25   high school in May 2018.  The District failed to provide him with any instruction or school

26   placement between May 2018 and September 2018, causing K.E. to miss the last eleven days of

27   his ninth grade year and approximately the first seven days of his tenth grade year.

28

140.     In September 2018, the District placed K.E. in a segregated nonpublic school that exclusively serves students with disabilities.  K.E. remained in this segregated setting for the duration of the 2018-19 school year.  He is still placed there for the 2019-20 school year.

141.     While segregated in a nonpublic school, K.E. does not receive equal access to California's comprehensive and rigorous high school curriculum, including access to the full A-G coursework required for University of California and California State University admission or the opportunity to enroll in Advanced Placement courses.  K.E. does not get to experience or participate in typical high school social experiences and rites of passage that are afforded to other SCUSD students, such as football games and dances.

142.     While segregated in a nonpublic school, K.E. experiences stigma and additional harms, such as multiple physical restraints.  By removing him from his community and typically developing peers, SCUSD has effectively denied K.E. meaningful access and participation in an integrated educational opportunity.

143.     Upon information and belief, K.E.'s experiences are illustrative of and result from the District's unlawful policies as outlined above.

*C.S.*

144.     C.S. is a nine-year-old student who attends a public elementary school operated by SCUSD.  C.S. is a fourth-grade student.

145.     C.S. enjoys playing basketball, and participates in multiple recreational leagues outside of school.  C.S. lives with his grandparents, who are his legal guardians, within the boundaries of the District.

146.     C.S. has been diagnosed with Autism Spectrum Disorder, Dyslexia, a specific learning disability in the area of written expression, and Attention-Deficit/Hyperactivity Disorder.  C.S. is a qualified individual with a disability under Section 504 and the ADA.

147.     From the 2015-16 school year to the 2018-19 school year, C.S. attended his neighborhood elementary school in SCUSD for kindergarten through third grade.  C.S. was one of fewer than three dozen Black students at his neighborhood school, which was located in one

1  of the wealthiest areas of Sacramento.  Although Black and White students each make up

2  approximately fifteen to seventeen percent of the District's enrollment in any given school year,

3  Black students made up only 5.2 percent of the students at C.S.'s school between 2015 and 2019

4  whereas about half of all enrolled students are White.  Upon information and belief, all or nearly

5  all of the academic staff at C.S.'s school were also White during this time period.

6       148.    After experiencing discrimination and harassment at his neighborhood school,

7  C.S. has transferred to a different public elementary school that is farther from his home for the

8  start of the 2019-20 school year.

9       149.    To date, the District has failed to provide C.S. with appropriate mental health,

10 behavioral, or social evaluations, supports, or services that would help him to be successful in the

11 general education environment.  In addition, upon information and belief, none of the teachers at

12 either of C.S.'s elementary schools is credentialed to be a primary instructor for students with

13 Autism Spectrum Disorder.

14      150.    To date, C.S. has not been provided with equal access to the instruction,

15 programs, and services available to other students at his school.  Instead, C.S. has been

16 frequently removed from his class during core parts of the curriculum.  He has been repeatedly

17 excluded from the District's extracurricular and afterschool activities and has been singled out

18 and subjected to shortened school days for prolonged periods of time.

19      151.    C.S. has never received culturally relevant and responsive education, programs,

20 and services while attending a District school.

21      152.    C.S. has also been subject to excessive and repeated exclusionary discipline.

22 During the 2018-19 school year, for example, nine-year-old C.S. was formally suspended from

23 his class on for seventeen school days – the equivalent of more than three weeks of school.

24      153.    In addition, C.S. was sent home or kept in the office for most of the school day,

25 and accordingly deprived of academic instruction, on many other occasions.  Upon information

26 and belief, the District did not document, track, or report C.S.'s additional removals from school

27 during the 2018-19 school year.

28

154.     The District failed to recognize in a timely manner that he had been removed for more than ten days of school or respond in a lawful manner.  Upon information and belief, C.S. did not receive any instruction or access to education on his eleventh day of removal and beyond during the 2018-19 school year.

155.     Upon information and belief, all of these suspensions and informal removals during the 2018-19 school year resulted from disability-related behavior or behavior related to his response to experiencing identity-based bullying and harassment.  Nevertheless, the District did not conduct a manifestation determination review until after C.S.'s seventeenth day of formal suspension.  Although the District determined that his conduct was a manifestation of his disabilities, the District failed to document the meeting or offer and conduct a functional behavior assessment.

156.     Upon information and belief, C.S. has been removed from class or had his school day administratively shortened without documentation on dozens of occasions since he started kindergarten in the District.

157.     Upon information and belief, on one or more occasions, C.S. was suspended for "willful defiance" while he was in kindergarten through third grade in violation of state law.

158.     These removals constitute excessive and unlawful exclusionary discipline.  They result in lost instructional time, hindering C.S.'s academic progress.  On a school campus that lacks diversity in race and ability, such targeted and persistent exclusion also stigmatizes C.S. and students like him, fostering an environment that is unwelcoming and unaccommodating.

159.     C.S. has been the repeated target of disability and race-based biases and stereotypes.  For example, rather than appropriately responding to and addressing his disability-based needs, school staff have repeatedly characterized C.S. as an aggressor or bully.  Upon information and belief, C.S. – the only Black student with Autism Spectrum Disorder at his school – was suspended and removed more than any other student in his school during the 2018-19 school year.

160.     Over the past few years, C.S. has become keenly aware that he is different from

1   other students.  He has started referring to himself as "bad" and struggling with suicidal thoughts

2   and actions.  As recently as spring 2019, he tried to run out into traffic to get hit by a car during

3   the middle of the school day.  When his grandparents and doctor requested an accommodation in

4   the form of temporary home instruction, District staff suggested in writing that he instead dis-

5   enroll from the District.

6          161.     In February 2019, C.S. filed for due process alleging that the District had failed to

7   provide him with a free appropriate public education as guaranteed by the Individuals with

8   Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., as well as violations under

9   Section 504, the ADA, Title VI, and California Government Code section 11135.  In March

10   2019, the Office of Administrative Hearings dismissed all non-IDEA claims for lack of

11   jurisdiction.

12          162.     Because of the District's policies that deny students with disabilities access to the

13   general education environment, C.S. is at constant risk of being removed from his elementary

14   school and placed in a segregated setting where he also will not have equal access to his public

15   education and where he is likely to be subjected to additional harms, such as a heightened risk of

16   restraint and seclusion.  He remains at constant risk of experiencing exclusionary discipline.

17          163.     Upon information and belief, C.S.'s experiences are illustrative of and result from

18   the District's unlawful policies as outlined above.

19                              **CLASS ALLEGATIONS**

20          164.     Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure,

21   Plaintiffs bring this action for injunctive and declaratory relief on their own behalf and on behalf

22   of all similarly situated students. The Plaintiffs seek to represent the following Classes in this

23   matter, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), as follows:

24          **CLASS 1**: All students who currently or will in the future reside within the boundaries of

25          SCUSD, who have known or suspected disabilities, who require or may require services,

26          accommodations, and/or modifications to access and benefit from their public education

27          in the general education environment, and who have been or will be deprived of those

28

1    services, accommodations, and/or modifications due to the policies alleged herein.

2

3    **SUBCLASS to CLASS 1**:  All Black students who currently or will in the future reside

4    within the boundaries of SCUSD, who have known or suspected disabilities, who require

5    or may require services, accommodations, and/or modifications to access and benefit

6    from their public education in the general education environment, and who have been or

7    will be deprived of those services, accommodations, and/or modifications due to the

8    policies alleged herein.

9    165.    This action is an appropriate class action under Rule 23(b)(2), as SCUSD has

10   acted or refused to act on grounds that apply generally to each Class, so that final injunctive

11   relief or corresponding declaratory relief is appropriate respecting each Class as a whole.

12   166.    **Numerosity**. The persons in these Classes are so numerous that joinder of all such

13   persons is impracticable.  Upon information and belief, there are currently approximately 6,000

14   SCUSD students with identified disabilities, including approximately 1,200 Black students with

15   identified disabilities.  Upon information and belief, almost half of these students are currently in

16   segregated settings.  Additionally, more than ten percent of SCUSD students with disabilities

17   receive recorded suspensions each year.  Accordingly, Defendants' deficient policies and

18   practices impact many hundreds of current and future students.

19   167.    **Commonality**. There are questions of law and fact common to each Class

20   identified above, namely:

21   Whether SCUSD's policies, procedures and practices related to segregating students with

22   disabilities, including through lack of timely identification and evaluation; denial of

23   services, accommodations, and modifications; discriminatory exclusionary discipline;

24   and failure to provide a safe learning environment violate Section 504, and the ADA; and

25   Whether SCUSD's policies, procedures and practices related to segregating students with

26   disabilities, including through lack of timely identification and evaluation; denial of

27   services, accommodations, and modifications; discriminatory exclusionary discipline;

28

1    and failure to provide a safe learning environment violate Title VI, the Equal Protection

2    Clause, and state law.

3        168.    **Typicality**. The claims of the Student Plaintiffs are typical of the claims of the

4    Classes, identified above, in that each of the Student Plaintiffs is a student with a disability that

5    qualifies him or her as eligible for services, accommodations, and modifications under Section

6    504 and/or the ADA, but Student Plaintiffs: (1) have not received a timely and appropriate

7    evaluation; (2) have not received timely and appropriate provision of services, accommodations,

8    and modifications; and (3) have been excluded from the general education environment in the

9    absence of those necessary services, accommodations, and modifications.

10        169.    **Adequate Representation**. The Student Plaintiffs will fairly and adequately

11    protect the interests of the Class and Subclass.  Student Plaintiffs do not have any interests

12    antagonistic to the members of any Class.  The relief sought by Student Plaintiffs will inure

13    benefit to the members of each Class. Additionally, Student Plaintiffs are represented by counsel

14    who are experienced, skilled, and knowledgeable about civil rights litigation, disability rights,

15    and class action litigation.

16    **LEGAL CLAIMS**

17    **FIRST CLAIM FOR RELIEF**

18    **Violations of Section 504**<br>**29 U.S.C. § 794, 34 C.F.R. Pt. 104**

19    **(On Behalf of All Plaintiffs and Class Members**<br>**Against Defendants District and Board of Education)**

20

21        170.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in

22    full herein.

23        171.    All Plaintiffs are, and Class Members are, or are suspected of being, qualified

24    individuals with disabilities within the meaning of Section 504 and are or may be otherwise

25    qualified to participate in or receive benefits from Defendants' programs or activities. 29 U.S.C.

26    § 794(a).

27        172.    Defendants SCUSD and Board of Education have been and are a recipient of

28

1    federal financial assistance sufficient to invoke the coverage of Section 504. *Id.* § 794(b)(3).

2        173.    As set forth above, Defendants' policies and practices violate the Section 504 and

3    unnecessarily segregate students with disabilities into highly restrictive placements and

4    discriminate against all Plaintiffs and Class Members by reason of their disability.  The

5    Defendants' policies and practices regarding identification and evaluation; provision of services,

6    accommodations, and modifications; student discipline; and addressing bullying and harassment

7    constitute a persistent and systemic failure to meet the requirements of Section 504.

8        174.    Thus, Defendants have deprived each Plaintiff and have or may deprive Class

9    Members of participation in and the benefits of general education.

10       175.    Defendants have further used methods of administration that have subjected

11   students with disabilities to discrimination on the basis of their disabilities.

12       176.    As a result of Defendants' violations, Plaintiffs have suffered, and Class Members

13   suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

14       177.    Due to Defendants' ongoing violations of Section 504 and implementing

15   regulations, injunctive and declaratory relief are appropriate remedies.

16                              **SECOND CLAIM FOR RELIEF**

17                          **Violations of Title II of the ADA**
                    **42 U.S.C. §§ 12131 *et seq.*, 28 C.F.R. § 35.130**
18               **(On Behalf of All Plaintiffs and Class Members Against All Defendants)**

19       178.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in

20   full herein.

21       179.    Each Defendant is either a public entity subject to Title II of the ADA or an

22   official responsible for supervising the operations of a public entity subject to Title II of the

23   ADA. 42 U.S.C. § 12131(1).

24       180.    All Plaintiffs and Class Members are, or are suspected of being, qualified

25   individuals with disabilities within the meaning of Title II of the ADA and meet the essential

26   eligibility requirements for the receipt of services, programs, or activities of Defendants. *Id.* §

27   12131(2).

28

181.    As set forth above, Defendants' policies and practices constitute a persistent and systemic failure to meet the requirements of Title II of the ADA and discriminate against all Plaintiffs and Class Members, by reason of their disability, by denying all Plaintiffs and Class Members an equal and equally effective educational opportunity in the most integrated setting appropriate, and instead providing all Plaintiffs and Class Members with a separate, different, and inferior educational experience.

182.    Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of from participation in or the benefits of services, programs, or activities of a public entity.

183.    Defendants have further used methods of administration that have subjected students with disabilities to discrimination on the basis of their disabilities.

184.    As a result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

185.    Due to Defendants' ongoing violations of Title II of the ADA and implementing regulations, injunctive and declaratory relief are appropriate remedies.

## THIRD CLAIM FOR RELIEF

**Violation of the Equal Protection Clause of the Fourteenth Amendment
to the U.S. Constitution and 42 U.S.C. § 1983
(On Behalf of All Plaintiffs and Subclass Members
Against Defendants Aguilar, Baeta, Ryan, Woo, Minnick,
Murawski, Garcia, Pritchett, and Vang in Their Individual Capacities)**

186.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

187.    Defendants Aguilar, Baeta, Ryan, Woo, Minnick, Murawski, Garcia, Pritchett, and Vang have, on the basis of race, intentionally discriminated against Plaintiffs and the Subclass Members by excluding and segregating Black students with disabilities from an equal education.  These Defendants have excluded and segregated Black students with disabilities by disciplining or allowing the discipline of Black students with disabilities and denying Black students with disabilities the services, accommodations, and modifications to which they are

1    entitled.

2         188.    These Defendants have demonstrated a widespread pattern of discrimination by

3    selectively enforcing facially neutral disciplinary policies, which has resulted in Black students

4    with disabilities being denied access to education, and for which there is no nondiscriminatory

5    justification.

6         189.    In addition, these Defendants have been deliberately indifferent to the hostile

7    educational environment that exists for Black students with disabilities in SCUSD, despite their

8    actual knowledge of this hostile educational environment.  In addition and in the alternative,

9    these Defendants' implicit and unconscious biases and stereotypes against Black students with

10   disabilities have been a significant factor in causing, allowing the continued existence of, and the

11   District's deliberate indifference to the gross race-based disparities in the discipline, exclusion,

12   segregation, and deprivation of services and supports for Black students.

13        190.    In addition, the Defendants' policies have had a disproportionate negative impact

14   on Black students with disabilities with regard to exclusion, segregation, discipline, harassment,

15   and deprivation of services and supports to which those students are entitled.

16        191.    The acts and omissions complained of were committed by the Defendants who

17   were at all times acting under color of state law to deprive the Plaintiffs and Subclass Members

18   of their federal right to equal protection within the meaning of 42 U.S.C. § 1983.

19        192.    As a result of Defendants' violations, Plaintiffs have suffered, and Subclass

20   Members suffer or may suffer, irreparable harm, including substantial losses of educational

21   opportunities.

22        193.    Due to Defendants' ongoing violations of the Equal Protection Clause, injunctive

23   and declaratory relief are appropriate remedies.

24                              **Fourth Claim for Relief**

25                    **Violations of Title VI and 42 U.S.C. § 1983**
                   **(On Behalf of All Plaintiffs and Subclass Members**
26                 **Against Defendants District and Board of Education)**

27        194.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in

28

1  full herein.

2      195.    Upon information and belief, Defendants SCUSD and Board of Education are

3  recipients of federal funding sufficient to invoke the coverage of Title VI.  42 U.S.C. § 2000d *et*

4  *seq.* Defendants have, on the basis of race, intentionally discriminated against Plaintiffs and the

5  Subclass Members by excluding and segregating Black students with disabilities from an equal

6  education.  These Defendants have intentionally denied Black students with disabilities the

7  services and supports to which they are entitled.

8      196.    These Defendants have demonstrated a widespread pattern of intentional

9  discrimination by selectively enforcing facially neutral disciplinary policies, in violation of Title

10  VI of the Civil Rights Act.  This selective enforcement has resulted in Black students with

11  disabilities being denied access to education, and for which there is no nondiscriminatory

12  justification.

13      197.    In addition, these Defendants have engaged in intentional discrimination by

14  denying Black students with disabilities access to education by being deliberately indifferent to

15  the hostile educational environment that exists for Black students with disabilities in SCUSD,

16  despite their actual knowledge of this hostile educational environment.

17      198.    The acts and omissions complained of were committed by these Defendants who

18  were at all times acting under color of state law to deprive the Plaintiffs and Subclass Members

19  of their federal right to nondiscrimination within the meaning of 42 U.S.C. § 1983.

20      199.    As a result of Defendants' violations, Plaintiffs have suffered, and Subclass

21  Members suffer or may suffer, irreparable harm, including substantial losses of educational

22  opportunities.

23      200.    Due to Defendants' ongoing violations of the Title VI, injunctive and declaratory

24  relief are appropriate remedies.

25              **Fifth Claim for Relief**

26          **Violations of California Government Code § 11135**
             **and Cal. Code Regs. tit. 2, § 11154**
27          **(On Behalf of All Plaintiffs and Subclass Members**
             **Against Defendants District and Board of Education)**
28

---

201.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

202.    California Government Code section 11135 prohibits discrimination against persons on the basis of race and other protected statuses in state-run or state-funded programs and activities.

203.    Upon information and belief, Defendants SCUSD and Board of Education are recipients of state funding.

204.    The District's application of policies in their administration of educational services within District schools has had and continues to have the effect of denying Plaintiffs and Subclass Members full and equal access to the benefits of the programs or activities administered by the District, or of subjecting Plaintiffs and Subclass Members to discrimination under such programs or activities, on the basis of their race.

205.    As a result of the manner in which the District has administered the policies described above, Plaintiffs and Subclass Members have been denied full and equal access to the benefits of educational opportunities within District schools, or have been subjected to discrimination under such programs or activities, on the basis of race, in violation of California Government Code section 11135(a) and Title 2 of the California Code of Regulation, section 11154.

206.    The District has therefore violated and continues to violate California Government Code section 11135.

207.    Plaintiffs and Subclass Members are entitled to injunctive relief to enjoin the District's violation of California Government Code section 11135.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.  Certify this case as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

2.  Appoint Plaintiffs as Class Representatives of the Classes and their attorneys as Counsel

1  for all Classes.

2  3. Declare that Defendants' policies, practices and procedures regarding segregation and

3  discipline of students with disabilities and regarding students with disabilities who

4  require access to services, accommodations, and modifications to access education in the

5  general education environment violate the rights of all Plaintiffs and Class Members

6  under Section 504, the ADA, and state law.

7  4. Declare that Defendants' policies, practices and procedures regarding segregation and

8  discipline of Black students with disabilities, and peer-on-peer and staff-on-student racial

9  harassment violate the rights of all Plaintiffs and Subclass Members under the Equal

10  Protection Clause, Title VI, and state law.

11  5. Issue permanent injunctions pursuant to Section 504, the ADA, the Equal Protection

12  Clause, Title VI, and state law that enjoin Defendants, their successors in office, agents,

13  employees and assigns, and all persons acting in concert from violating Section 504, the

14  ADA, the Equal Protection Clause, Title VI, and state law and require Defendants to

15  promulgate compliant policies, procedures, and practices.

16  And order Defendants to:

17  6. Immediately discontinue all policies, procedures and practices that do not comply with

18  the laws cited in this complaint;

19  7. Create and broadly disseminate to teachers and other District staff, parents, and students a

20  new Board of Education-approved written policy statement, which must include the

21  following, acknowledging the rights of students with disabilities and Black students with

22  disabilities as set forth in this complaint, and reasserting Defendants' commitment to

23  honor those rights, including:

24  a. The right of access to the same educational opportunities as their peers regardless

25  of disability or race;

26  b. The right to services, accommodations, and modifications necessary to remain in

27  the general education environment; and

28

c.   The right to an educational environment free of discriminatory discipline and harassment and bullying;

8.   Take immediate action to reform policies, procedures and practices to fully comply with Section 504, ADA the Equal Protection Clause, Title VI, and state law; such action must include securing a team of third-party experts to assist the District to:

a.   Develop and implement a clear and defined plan to achieve inclusivity for all students throughout the District, including students with disabilities and Black students with disabilities, that enables these students to receive access to equal education side-by-side with their peers without disabilities in a safe and welcoming educational environment;

b.   Implement a districtwide Multi-Tiered System of Supports to identify the needs of and improve educational outcomes for all students using multiple data measures, and to provide strategic, targeted, appropriate, and culturally relevant interventions for all students that are available regardless of a student's disability, status or race;

c.   Establish appropriate programs, that are based on peer-reviewed research or other evidence-based programs to provide services, accommodations, and modifications to students with disabilities in the general education environment;

d.   Provide for immediate and continuing education for all District staff and evaluation of progress toward compliance with Section 504, ADA the Equal Protection Clause, Title VI, and state law by qualified third-party experts;  such education or training must include:

i.   identification of students with disabilities,

ii.   provision of appropriate and culturally relevant instruction, services, accommodations, and modifications in the least restrictive environment,

iii.   stopping and preventing harassment and bullying based on disability or race,

1                  iv.  eliminating or significantly reducing reliance on exclusionary discipline,

2                  v.  implicit bias, and

3                  vi.  administration of discipline without racial discrimination;

4        e.  Develop and implement a system to identify staff who are not complying with any

5           of the laws cited in this Complaint, retrain and provide appropriate supports to

6           any such staff to enable them to come into compliance, and take appropriate

7           disciplinary action regarding any staff who fail to come into compliance after

8           such retraining or provision of supports;

9        f.  Analyze the current racial make-up of the District's teachers, social workers and

10          psychologists, respectively, relative to the current racial make-up of the District's

11          student body; create and implement separate  plans that include clear goals to

12          increase the diversity of the teachers, social workers, and psychologists,

13          respectively, based on the foregoing analysis; and achieve substantial compliance

14          with those plans and goals within three years and total compliance within seven

15          years;

16        g.  Analyze all aspects of education for students with disabilities in the District for

17          implicit racial bias and structural discriminatory racialization; develop a

18          comprehensive plan to eliminate or mitigate such bias and discrimination; and

19          achieve substantial compliance with such plan within three years and total

20          compliance within seven years;

21        h.  Review and analyze the credentials and qualifications of all District

22          administrators and staff; identify gaps in credentials or qualifications to

23          administer or instruct students with disabilities; develop a detailed plan to

24          eliminate such gaps; and achieve substantial  compliance with such plan within

25          three years and total compliance within seven years; and

26        i.  Determine appropriate District staffing levels, staff qualifications, methods of

27          data collection and analysis, and effective measures to prevent and protect all

28

students, including students with disabilities and Black students with disabilities,
against bullying; develop a detailed plan based on such determination; and
achieve substantial compliance with such plan within three years and total
compliance within seven years.

9.  Enjoin all disciplinary action, including any pending action, against any Black student
with disabilities unless a manifestation determination has been completed, and maintain
such injunction until a districtwide Multi-tiered System of Services and Supports has
been implemented and determined effective by a qualified third-party expert or experts;

10. Enjoin the use of so-called District Student Study Teams until a districtwide Multi-Tiered
System of Supports is in place and a qualified third-party expert or experts have
determined whether the District should continue use of such teams;

11. Offer assessments or reassessments to all students enrolled in the District who requested
assessment for disability or who were referred to a Student Study Team within the last
two years;

12. Offer all Black students currently enrolled in the District who have been classified as
having Emotional Disturbance the option of having an independent educational
evaluation at the District's expense, and provide such assessments for all students who
accept the offer;

13. Identify, offer, and provide services, accommodations, and modifications to all students
found eligible for the same in accordance with Section 504 and the ADA; and

14. Provide the Court and the public with an annual report on the District's compliance with
the Court's orders for four consecutive years.

Plaintiffs further respectfully request that the Court:

15. Retain jurisdiction of this case until Defendants have fully complied with the orders of
this Court, and there is reasonable assurance that Defendants will continue to comply in
the future absent continuing jurisdiction;

16. Award Plaintiffs reasonable attorneys' fees, costs, and disbursements as authorized by

law; and

17. Grant further relief as the Court may deem just and proper.


DATED:  September 5, 2019                Respectfully submitted,

                                         MONA TAWATAO
                                         EVA PATERSON

                                         **EQUAL JUSTICE SOCIETY**

                                         /s/ Mona Tawatao (as authorized on 9/5/2019)
                                         _____
                                         Mona Tawatao
                                         *Attorneys for Plaintiffs*


                                         CARLY J. MUNSON
                                         BRIDGET CLAYCOMB

                                         **DISABILITY RIGHTS CALIFORNIA**

                                         /s/ Carly J. Munson
                                         _____
                                         Carly J. Munson
                                         *Attorneys for Plaintiffs*


                                         MICHAEL HARRIS

                                         **NATIONAL CENTER FOR YOUTH LAW**

                                         /s/ Michael Harris (as authorized on 9/5/2019)
                                         _____
                                         Michael Harris
                                         *Attorneys for Plaintiffs*


                                         ANTOINETTE DOZIER
                                         RICHARD ROTHSCHILD

                                         **WESTERN CENTER ON LAW AND POVERTY**

                                         /s/ Antoinette Dozier (as authorized on 9/5/2019)
                                         _____
                                         Antoinette Dozier
                                         *Attorneys for Plaintiffs*